## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## NORTHERN DIVISION

LORI CORELL,

       Plaintiff,                     CASE NO. 06-CV-13895

v.                             DISTRICT JUDGE THOMAS LUDINGTON
                                   MAGISTRATE JUDGE CHARLES BINDER

CSX TRANSPORTATION, INC.,

       Defendant.
_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
(Dkt. 28)

## I.    RECOMMENDATION

For the reasons set forth below, **IT IS RECOMMENDED** that Defendant's motion be **GRANTED**.

## II.    REPORT

### A.    Introduction

By order of United States District Judge Thomas Ludington, this gender discrimination employment case brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 *et seq.*, was referred to this magistrate judge for pretrial case management on September 20, 2006. (Dkt. 2.) On May 18, 2008, Defendant filed the instant motion for summary judgment. Plaintiff responded (Dkt. 31), Defendant replied (Dkt. 40), and oral

argument was held on July 16, 2008.  Accordingly, this matter is ready for Report and Recommendation.

### B.    Background Facts and Parties' Arguments

Plaintiff Lori Corell worked for Defendant CSX Transportation, Inc., ("CSX") as a brakeman/flagman/conductor, from August 31, 1998, until her dismissal on January 13, 2005. (Def.'s Mem. in Supp. of Mot., Dkt. 28 at 9-10; Pl.'s Dep., Dkt. 28, Ex. 11 at 80[1]; Pl.'s Resp. to Mot., Dkt. 31 at 3.)  Plaintiff asserts that she was terminated by either Mr. Tuchek or Mr. Burrus based on her gender[2] and has stated that she has no direct evidence to support that conclusion.  (Dkt. 31 at 3; Dkt. 28, Ex. 12 at 64-65, 96.)  When asked what acts Defendant committed to support her allegation that she was wrongfully terminated, Plaintiff responded, "Because they fired me; I should have had the 30 days off and that would have be [sic] it, and I would have gladly done that.  But they had a hearing and then I got a letter and I was fired." (Dkt. 28, Ex. 12 at 97.)

Defendant counters that Plaintiff was terminated because of an incident that occurred on November 20, 2004, when Plaintiff allowed a train to enter onto a restricted area of track where a contractor was working; Defendant thus asserts that Plaintiff's termination had nothing to do with gender.  (Dkt. 28 at 8-9; Dkt. 31 at 3.)

The facts of the incident are largely undisputed.  According to Plaintiff, on November

---

[1]I note that the parties' exhibit numbers and the electronic docket exhibit numbers do not match.  For example, Defendant's "Exhibit 10-A" is accessed by clicking on the "#11 Exhibit" hyperlink.  For ease of reference, in this Report and Recommendation all exhibit numbers refer to the electronic docket hyperlink number and page numbers refer to the page of the corresponding PDF document.

[2]Plaintiff originally claimed age and gender discrimination but chose not to further pursue the age discrimination claim. (Dkt. 31 at 3.)

20, 2004, she contacted dispatch and learned that train Q322 was coming up to "Holly Diamond" track. (Dkt. 28, Ex. 14 at 87.) She resumed her conversation with the foreman when the "defect detector went off." (*Id.*) She "went down to the bridge where the tracks were with the lift and told the [contractors] to start taking the lift off the tracks." (*Id.*) The workers acknowledged her and started to move the lift. (*Id.* at 92.) When the train asked for permission to enter, the lift was 20-30 feet from being out of harm's way, so Plaintiff "[g]ave them permission and as I gave them permission, I turned around and realized that [the contractors had] stopped to take and put their boards reposition them by the tracks and they had never done this before.[3] As they did that I told 32220 to ease 'em up and then they were coming around the corner." (*Id.* at 87, 92.) Once Plaintiff realized that the train was not going to be able to stop in time, she "told the [contractors] to get out of the way and make sure they were clear." (*Id.* at 93.) Although emergency braking was used, the train struck the lift, destroying the contractor's equipment and derailing the train. One of the contractor's employees was forced to jump off the equipment to avoid being hit. For the next five hours, the track was blocked while the wreckage was cleared. (*Id.*; Dkt. 28 at 8, 14.)[4] Plaintiff acknowledged in her written statement that she "gave them permission through thinking the guys would have enough time to get the lift off." (Dkt. 28, Ex. 14 at 87.) Plaintiff further stated that in the past when she had given permission under similar circumstances, the

---

[3]Plaintiff clarified that she meant that the contractors stopped to readjust the boards they use to remove equipment, such as the lift. (Dkt. 28, Ex. 14 at 93.) In her affidavit, Plaintiff notes that "they stopped to rearrange the boards which they had never done before in my experience working with them approximately fifteen times that same month." (Dkt. 32.)

[4]For a more formal description and detailed chronology of the events that day, please refer to A. J. Erdman's report of the incident. (Dkt. 28, Ex. 14 at 107-09.)

workers had cleared the tracks in that same amount of time. (Dkt. 28, Ex. 14 at 91, 97.) Although Plaintiff views these former occasions as support for the reasonableness of her conduct that day, Defendant views them as probative of a pattern of violation of policies, since policy dictates that a train not be given permission to enter a track until after any equipment or workers are completely clear of the track. (Dkt. 28, Ex. 14 at 97; Dkt. 40 at 3.) Plaintiff states that she did not intend to cause injury or damage to any person or property. (Dkt. 28, Ex. 14 at 96; Dkt. 32.) The equipment damaged in the accident was valued between $85,000 and $125,000. The locomotive damage amounted to $2,600. (Dkt. 28, Ex. 14 at 56.) Although there were no reported injuries at the time, the train engineer later filed an injury claim. (Dkt. 28 at 8.)

Plaintiff concedes that her actions that day violated two portions of Defendant's Rule 72, specifically, those provisions that require a flagman to "ascertain which track the approaching movement is located and that all contractor equipment and personnel are clear of that track before permission for rail movement is given" and which provides that when "workers request permission to obstruct a track," the flagman "must not permit movements to enter the work location until the track is no longer obstructed." (Dkt. 28, Ex. 14 at 25 (Rule), 95 (Pl.'s testimony at formal investigation hearing).)

Martha Gill, Manager of Field Administration, reviewed the facts and prepared a charge letter, advising Plaintiff that a formal investigation hearing would be held. (Dkt. 28 at 11.) The hearing was held and the transcript was sent to Plaintiff, Field Administration, the Labor Relations Department, the Division Manager and the Regional Vice President of Defendant corporation for review. (*Id.* at 11-12.) Plaintiff was terminated by Pete Burrus,

the Division manager, after he consulted with the Field Administration and the Regional Vice President, Tony Tuchek.  (Dkt. 28 at 15.)  Plaintiff asserts that the "ultimate final decision rests with the Vice President of the Northern Region, Tony Tuchek."  (Dkt. 31 at 14.)

Plaintiff availed herself of the appellate procedures available under the Collective Bargaining Agreement ("CBA") and the Railway Labor Act, 45 U.S.C. § 151 *et seq*.  (Dkt. 28 at 15.)  After being denied relief at these levels, Plaintiff filed the instant complaint.

### C.     Applicable Standard of Review and Governing Law

### 1.     Rule 56(c) Motion for Summary Judgment

A motion for summary judgment will be granted under Rule 56(c) of the Federal Rules of Civil Procedure where "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c).  All facts and inferences must be viewed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).  The moving party has the initial burden of showing the absence of a genuine issue of material fact as to an essential element of the non-movant's case.  *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989) (citing *Celotex Corp. v Catrett*, 477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)).  In determining whether the moving party has met its considerable burden, a court may consider the plausibility of the moving party's evidence.  *Matsushita*, 475 U.S. at 587-88.  Summary judgment is also proper where the moving party shows that the non-moving party is unable to meet its burden of proof. *Celotex*, 477 U.S. at 326.

In response, the non-moving party cannot rest merely on the pleadings alone. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Instead, the non-moving party has an obligation to present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos*., 8 F.3d 335, 339-40 (6th Cir. 1993). When the nonmoving party fails to adequately respond to a summary judgment motion, a district court is not required to search the record to determine whether genuine issues of material fact exist. *Street*, 886 F.2d at 1479-80. Instead, the court will rely upon the "facts presented and designated by the moving party." *Guarino v. Brookfield Twp. Trustees*, 980 F.2d 399, 404 (6th Cir. 1992). The Sixth Circuit has explicitly instructed that it is "utterly inappropriate for the court to abandon its position of neutrality in favor of a role equivalent to champion for the non-moving party: seeking out facts, developing legal theories, and finding ways to defeat the motion." *Id.* at 406.

After examining the evidence designated by the parties, the court then determines "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Booker v. Brown & Williamson Tobacco Co.,* 879 F.2d 1304, 1310 (6th Cir. 1989) (quoting *Anderson*, 477 U.S. at 251-52). Summary judgment will not be granted "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

## 2. Title VII Employment Discrimination Claims

Title VII, 42 U.S.C. § 2000 *et seq*., prohibits employers from discharging, or otherwise discriminating against, an individual with respect to compensation, terms,

conditions, or privileges of employment because of race, color, religion, sex, or national origin. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116, 122 S. Ct. 2061, 153 L. Ed. 2d 106 (2002); *Phillips v. Cohen*, 400 F.3d 388, 397 (6th Cir. 2005). Absent direct evidence of racial discrimination, the plaintiff bears the initial burden of production under the *McDonnell Douglas* burden-shifting scheme, *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), to show a prima facie case of discrimination. *Michael v. Caterpillar Financial Servs. Corp.*, 496 F.3d 584, 593 (6th Cir. 2007).

The elements of a prima facie case under Title VII are: (1) plaintiff is a member of a protected class, (2) she was subject to an adverse employment action, (3) she was qualified for the position at issue, and (4) she was replaced by someone outside of the protected class or a similarly situated person outside of the protected class was treated more favorably. *Wright v. Murray Guard, Inc.* 455 F.3d 702, 707 (6th Cir. 2006); *Noble v. Brinker Intern., Inc.*, 391 F.3d 715, 728 (6th Cir. 2004).

If a plaintiff meets this initial burden, this "creates a rebuttable presumption of discrimination, and the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for taking the challenged [] action." *Carter v. University of Toledo*, 349 F.3d 269, 273 (6th Cir. 2003). If the defendant articulates a legitimate, nondiscriminatory reason, the burden of production shifts back to the plaintiffs to "'prove that the proffered reason was actually a pretext to hide unlawful discrimination.'" *Id.*

The salient issue in a Title VII claim of discrimination is whether the plaintiff was singled out because of his or her membership in a protected class and treated less favorably

than those outside the class, not whether the plaintiff was treated less favorably than "someone's general standard of equitable treatment." *Batts v. NLT Corp.*, 844 F.2d 331, 337 (6th Cir. 1988) (citations omitted).

### D.      Analysis and Conclusions

### 1.      Prima Facie Case

The first three elements of Plaintiff's prima facie case are not contested. Therefore, the Court presumes that Plaintiff is a member of a protected class and that she was terminated despite the fact that she was qualified for the position. The fourth element, that she was treated differently than a similarly situated person outside of her protected class, is the first issue raised in Defendant's motion. (Dkt. 28 at 16-18, 20-22.)

### a.      Whether Plaintiff was Treated Differently than a Similarly Situated Person

To satisfy the similarly situated requirement, a plaintiff must show that the suggested comparable employee is similar in "all of the *relevant* aspects." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998) (citations omitted) (emphasis in original).[5] The relevant aspects include whether the plaintiff and the comparable employee: (1) share the same supervisor; (2) are subject to the same standards; and (3) have engaged in the same conduct "without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Id.* (citations omitted).

---

[5]Although some unpublished Sixth Circuit opinions have required the comparators to be "nearly identical" in all relevant aspects, these decisions do not carry the precedential weight that the *Ercegovich* decision does. (Dkt. 28 at 21.) Nor does the Fifth Circuit's "nearly identical" standard, cited by Plaintiff (Dkt. 31 at 10), bind this Court. *See Perez v. Texas Dept. Criminal Justice Div.*, 395 F.3d 206 (5th Cir. 2004).

The plaintiff and the proposed comparators must have engaged in acts of "comparable seriousness." *Wright,* 455 F.3d at 710.

### i.     Same Supervisor

The "same supervisor" criterion "has never been read as an inflexible requirement" and may not always be relevant where "all of the people involved in the decision-making process, including plaintiff's immediate supervisor and the department manager, were well-aware of the discipline meted out to past violators, including [the non-protected employee], who had violated the policy on at least two occasions." *Seay v. Tenn. Valley Auth.*, 339 F.3d 454, 479 (6th Cir. 2003) (cited with approval in *McMillan v. Castro*, 405 F.3d 405, 414 (6th Cir. 2005) ("same supervisor" construed to include cases where both employees were handled by the same "ultimate decision-maker")).  Therefore, under *McMillan* and *Seay*, "two employees who are directly supervised by different individuals are not necessarily dissimilar if the same member of management disciplined both the plaintiff and the comparable employee." *Barry v. Noble Metal Processing*, No. 07-1674, 2008 WL 1988766, *4 (6th Cir. May 7, 2008) (finding that employees were not similarly situated where there were "critical differences" between their conduct and where they "shared neither the same immediate supervisor nor were their disciplinary matters handled by the same ultimate decision-maker").  Correspondingly, where employees are disciplined by different ultimate decision-makers (and for different conduct), the Sixth Circuit has held that the employees are not similarly situated. *See Smith v. Leggett Wire Co.*, 220 F.3d 752, 762-63 (6th Cir. 2000).

In this case, Plaintiff points to J. W. and H. A.[6] as proposed comparators[7] who were given 30-day suspensions rather than being terminated. (Dkt. 28, Ex. 12 at 73.) Plaintiff concedes that she has no direct knowledge of the circumstances surrounding the incidents leading to the discipline of these two individuals but had merely heard about them at work. (Dkt. 28, Ex. 11 at 95-100, Ex. 12 at 2-9.)

As to Plaintiff's first suggested comparator, on October 24, 2003, H. A. gave a train permission to proceed after seeking and receiving assurance from the contractor that his equipment had been cleared from the track. (Dkt. 28 at 17, Ex. 7 ¶ 7.) After H.A. gave permission, the contractor began moving equipment onto the track without H.A.'s permission or knowledge. (*Id.*) As the train passed the contractor's equipment, it snagged a spray hose and pulled the equipment over but did not derail nor damage the train in any way. (*Id.* ¶ 8.) The H.A. incident was investigated by Paul Parent, Trainmaster. (*Id.*) H.A. had worked for Defendant for over 30 years at the time of the incident, and had three efficiency test failures and one prior derailment incident in his entire employment record. (Dkt. 32 at Ex. 3.)

As to Plaintiff's second proposed comparator, on June 11, 2003, J. W. gave permission for a train to enter a track when a contractor's employees had gone to lunch and were not on the track. (Dkt. 28 at 10, Ex. 6 ¶¶ 7-9.) After granting permission, an employee of the contractor asked J.W. whether any trains were coming. J.W. answered affirmatively and the contractor's employee inquired whether the "shields" had been removed. (Dkt. 31

[6]Since the employment records of the suggested comparators are appropriately sealed to protect their privacy interests, the full names of the individuals will not be used.

[7]The term "comparators" and "comparables" are synonyms and are used interchangeably in this Report.

at Ex. 2.) The "shields" are wooden fail guards. (Dkt. 28 at 10, Ex. 6 ¶¶ 7-9.) J.W. stated he had no knowledge either way. The contractor looked down from the bridge to the roadbed and saw the "shields" still in place. (Dkt. 31 at Ex. 2.) J.W. attempted to contact the train twice to inform the train to stop but he was unsuccessful. The train continued forward, hit the shields, and derailed. (*Id.*) The J.W. incident was investigated by Dan Miklos, Superintendent of Operations, and Ms. Gill was the Field Administrator who notified J.W. of the formal investigation. (Dkt. 28 at 10, Ex. 6 ¶ 3; Dkt. 31 at Ex. 2.) The J.W. incident resulted in approximately $758,000 worth of damage and the crew members who were trapped inside the engine by debris had to be rescued by emergency personnel. (Dkt. 31 at Ex. 2.) One crew member was admitted to the hospital with critical injuries, including a torn aorta. (*Id.*) J.W. had worked for Defendant for 3.5 years at the time of the incident. (Dkt. 31 at Ex. 2.) J.W. had one prior "missed call" on his employment record at that time. (*Id.*)

The parties do not dispute that Plaintiff was supervised by a different person than the proposed comparators. ( Dkt. 31 at 14; Dkt. 40 at 3.) Furthermore, Plaintiff offers no evidence that Mr. Tuchek or Mr. Burrus had any knowledge of the manner in which J.W. or H.A. were disciplined. Defendant denies that either Mr. Burrus or Mr. Tuchek had any such knowledge. (Dkt. 40 at 2, Exs. 4, 15.) At oral argument, the parties concurred that the proposed comparators also violated Rule 72. The parties further agreed that there is no "hierarchy" when considering the factors regarding comparability.

As to the "same supervisor" factor, it is undisputed that the proposed comparators did not share the same supervisor. Determining who the "ultimate decision-maker" was, however, is a more challenging task. Although Plaintiff argues that Mr. Tuchek is the

ultimate decision-maker (Dkt. 31 at 14), from Defendant's perspective, Mr. Burrus actually

made the decision after consulting with Mr. Tuchek and Ms. Gill.  (Dkt. 28 at 15.)[8]

However, this determination is immaterial since neither Mr. Burrus or Mr. Tuchek were

involved in the disciplinary decisions of the comparators.  Since Plaintiff was supervised by

a different person, the ultimate decision-maker was different and the evidence provided gives

no indication that Mr. Burrus had any knowledge of the discipline meted out to the proposed

comparators.  Therefore, I find that the "same supervisor" factor militates against finding

J.W. and H.A. comparable.

### ii.      Same Standards

 As to the "subject to the same standards" factor, I find that since the proposed

comparators were subject to and violated the same rule (Rule 72), this factor works in favor

of finding J.W. and H.A. comparable.  Thus, the first two factors cancel one another out in

my estimation.

### iii.     Same Conduct

The third factor regarding comparability is whether the suggested comparators

engaged in the same conduct without differentiating or mitigating circumstances that would

distinguish their conduct or the employer's treatment of them for it.  *See Ercegovich, supra.*

As to severity of the consequences of the employee's conduct, H.A. caused much less severe

damage but J.W. caused significantly more when considering the monetary cost and the fact

that a person was seriously injured.  Although Defendant argues that Plaintiff's conduct

---

[8]The materials submitted indicate that Ms. Gill also notified Mr. White of the formal investigation.  (Dkt. 31 at Ex. 2.)

caused more severe consequences because the track was rendered impassable for five hours and an injury claim was filed by an employee, I suggest that the immediate personal injury suffered as a result of J.W.'s actions renders the consequences of J.W.'s actions comparable to the resulting damage caused by Plaintiff.

As to length of service, at the time of H.A.'s incident, H.A. had worked for Defendant for over thirty years, which is significantly longer than Plaintiff, who had worked for Defendant for six years. On the other hand, J.W.'s three and a half years of service is sufficiently comparable to Plaintiff's six years.

Defendant attempts to distinguish the comparators based on the "time period" involved, but I suggest that the difference between 2003 and 2004 is not significant.

The past disciplinary records of the proposed comparators show that H.A. had one derailment and three efficiency test failures in his over thirty years with Defendant and J.W. had only one prior "missed call" on his record at the time they were given their thirty-day suspensions. Plaintiff, on the other hand, had "missed calls" in August 2001 and March 2002, had received a time-out in April 2002 for mounting moving equipment, was disciplined for a violation of Rule 103a in November 2002, and was disciplined in December 2002 for bringing an engine ahead without checking the switch, causing a derailment. (Dkt. 28, Ex. 11 at 13-14.)[9] I find that the past disciplinary records of J.W. and H.A., therefore, are not comparable to Plaintiff's record.

As to the conduct of the proposed comparators, Defendant argues that neither J.W. nor

---

[9]Plaintiff denies having been disciplined in December of 2002 for violating Rule 104a. (*Id.*)

H.A. made a "conscious decision," as Plaintiff did, to permit a train to enter a track while knowing that contractors were on the track. They assert that Plaintiff's belief that the contractors had sufficient time to remove their equipment before the train reached them is not relevant because the rule clearly mandates that a flagman not give permission to enter the track until he or she is sure that all equipment and workers have cleared the track. In its reply brief (Dkt. 40 at 3-4) and at oral argument, Defendant heavily relies on Plaintiff's affirmative answer to the following question posed at the formal investigation hearing: "So you made a conscious decision to give the train crew permission into the flagging limits thinking there was sufficient time for the high lift crane operators to remove the piece of equipment, after you gave permission is that correct?" (Dkt. 28, Ex. 14 at 97; Dkt. 40 at 3.) Plaintiff testified at her own deposition that she had read the transcript of the formal investigation. (Dkt. 28, Ex. 12 at 89.) When asked if she had found any inaccuracies in the transcript, the following exchange took place:

Q. What does it relate to, maybe I can find it?

A. It is relating to the fact that Keith Hunt asked me if I have done this before and I said yes, and we were both on the same page as far as I would always make sure the tracks were clear when I let my train through. But as it was started, it sounds like I have tried to do this – let the train come through and try to get the crew off in a hurry and that's not what was meant by that and I think he amended that – is that what you call it? I think he sent another letter out stating that that is not the way he wanted it referred.

Q. Okay. Tell me if this is the section of your testimony that you are talking about.

A. What page are you on?

Q. I am on page 53 – actually starting on 52, Mr. Hunt asked you if there

was any intent to purposely cause injury and you said no. He asked if it was deliberate and you said it was not in any way deliberate. And then he had no further questions.

Page 53, up at the top, and then Mr. Johns asked some follow-up questions. And line 16 – do you see how it is numbered on the sides here, line 16?

A.     Correct.

Q.     He says your statement states that you gave permission thinking the guys would have sufficient time to get the lift off, and you said that's correct. And he says, so you made a conscious decision to give the train crew permission into the flagging limits thinking there was sufficient time for the hi-lift crane operator to remove the piece of equipment after you gave permission; is that correct?

A.     Correct.

Q.     And then Mr. Johns says: I have no further questions. And then Mr. Hunt says: Lori, in the past is this the exact same way that you always do it. And you said: Yes. And he said: And they always – and they had always gotten in the clear. And you said: Yes.

A.     Correct.

Q.     What is inaccurate about that?

A.     Because in this one here it says where it says on line 21 there –

Q.     Uh-huh.

A.     – it says, so you made a conscious decision to give the train crew permission thinking there was sufficient time for the hi-lift operators to remove the piece after you gave permission. And that wasn't true, I gave – yeah, I got the equipment off and then I gave the train permission. So the way it was worded sounded like I was trying to get the train in and get the crew off is the way that Mr. Hals took that. He explained it after the fact, you know, that we should have been a little more clear on that.

Q.     It is not the second part where in the past this is the exact same way –

A.     I would have to go through it.  I think that this is the situation here.  There is the amendment letter so –

Q.     So whatever inaccuracy there was you believe was cleared up by Mr. Johns?

A.     Correct –

Q.     Not by Mr. Johns but by Mr. Hunt's letter?

A.     Correct.

(Dkt. 28, Ex. 12 at 90-93.)  I suggest that this exchange evidences Plaintiff's desire to simply clarify that she did not intend to bring the train in with crew members and equipment present, but rather, that she mistakenly thought, based on past experience, that the crew had ample time to remove the lift and themselves from the area before the train arrived.  I find that her answer, this exchange, and her deposition testimony referenced above are consistent.

In contrast to Plaintiff's incident, H.A. had sought and received assurance from the contractor that the track was clear and after he gave permission, the contractor placed equipment on the tracks.  (Dkt. 28, Ex. 7 ¶ 7.)  H.A. appeared to have done all he could do to assure clearance before giving permission and his only failure was not double-checking on the status of the track after having properly given permission for the train to proceed.  Therefore, I suggest that the conduct of H.A. is not comparable to that of Plaintiff.

Since all the considerations under this third factor point to lack of comparability between Plaintiff and H.A., I suggest that H.A. is not comparable as a matter of law.

Turning to J.W.'s incident, as noted by Defendant, J.W. did not grant permission knowing that the contractor or his equipment was still on the track; however, J.W.'s conduct approaches reckless disregard of the possibility.  Although J.W. knew that the contractor's

employees had gone to lunch, he failed to simply look down from the bridge to the tracks before granting permission for the train to approach. According to the incident report, the contractor's employee, who asked Plaintiff whether the shields had been removed, was able to look down from the bridge and see that the shields were still in place. (Dkt. 31 at Ex. 2.) I suggest that J.W.'s failure to look for the shields or any other equipment prior to granting permission, though not a conscious decision, was reckless and is sufficiently close to "conscious" to approach comparability with Plaintiff's conduct.

**b.    Conclusion**

Since J.W.'s conduct, the consequences of his conduct, and his years of service incline toward comparability, I suggest that Plaintiff has at least created a genuine issue of material fact as to whether J.W. is similarly situated to Plaintiff and thus, that Plaintiff has sufficiently stated a prima facie case to survive summary judgment. *Cf. Mazur v. Wal-Mart Stores, Inc.*, 250 Fed. App'x 120, 127 (6th Cir. 2007) (finding suggested comparables were not similarly situated where plaintiff was on probation while other employees who committed the same act of using a customer product without permission were not); *Benjamin v. Brachman*, 246 Fed. App'x 905, 926 (6th Cir. 2007) (finding suggested comparables were not similarly situated because although supervised by the same supervisor, the decision to revoke medical privileges was not made by the same decision-maker and where treatment of patients led to problems of differing severity); *Walker v. Ohio Dep't of Rehab. and Correction*, 241 Fed. App'x 261, 267 (6th Cir. 2007) (finding suggested comparable was not similarly situated where he answered to a different supervisor, he was not in a supervisory position as was plaintiff, and plaintiff's "exercise of poor judgement, which exposed an inmate to further

abuse" was "vastly different misconduct" than the suggested comparable's "err[or] in not taking appropriate steps to prevent it"); *Opsatnik v. Norfolk Southern Corp.*, No. 06-81, 2008 WL 763745, at *9 (W.D. Pa. Mar. 20, 2008) (finding suggested comparables not similarly situated although they also committed "major" offenses under the policy because that category covered a wide variety of offenses but the seriousness depended on circumstances of each offense and where, unlike the others, Plaintiff "intentionally disregarded a safety directive from a dispatcher" while driving hazardous materials); *Brown v. Kansas City Southern Railway*, No. 05-1106, 2007 WL 1347787, at *3 (W.D. La. May 8, 2007) (finding suggested comparable not similarly situated where although he also derailed a train, plaintiff's "alleged misconduct involves disobeying direct orders of his supervisors" and the comparable did not).

### 2.      Legitimate Nondiscriminatory Reason

Once Plaintiff has met her burden of establishing a prima facie case, the burden shifts to Defendant to come forward with a legitimate nondiscriminatory reason for the adverse employment action. *Carter*, 349 F.3d at 273. In this case, Plaintiff does not contest the fact that Defendant has articulated a legitimate nondiscriminatory reason for her termination, i.e., the November 20, 2004, train incident. Accordingly, the burden of production then shifts back to Plaintiffs to "'prove that the proffered reason was actually a pretext to hide unlawful discrimination.'" *Id.*

### 3.      Pretext

A proffered reason is pretextual if it "(1) has no basis in fact, (2) did not actually

motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Dews v. A.B. Dick Co.,* 231 F.3d 1016, 1021 (6th Cir. 2000). *See also Imwalle v. Reliance Med. Products, Inc.*, 515 F.3d 531, 545 (6th Cir. 2008); *Wheeler v. McKinley Enters.*, 937 F.2d 1158, 1162 (6th Cir. 1991). In order to show there was no basis in fact for the decision made, "a Plaintiff must put forth 'evidence that the proffered bases for the plaintiff's discharge never happened, i.e., that they are factually false.'" *Abdulnour v. Campbell Soup Supply Co. LLC*, 502 F.3d 496, 502-03 (6th Cir. 2007) (citations omitted) (granting summary judgment where "Plaintiff fails to provide evidence that these complaints were false, inaccurate, or not made"). In order to show that Defendant's proffered reason did not actually motivate the defendant's challenged conduct, "Plaintiff must show 'that the sheer weight of the circumstantial evidence of discrimination makes it "more likely than not" that the employer's explanation is a pretext or coverup.'" *Id.* at 503 (citations omitted). "The reasonableness of the employer's reasons may of course be probative of whether they are pretexts. The more idiosyncratic or questionable the employer's reason, the easier it will be to expose as a pretext, if indeed it is one." *Loeb v. Textron, Inc.*, 600 F.2d 1003, 1012 n.6 (1st Cir. 1979) (quoted with approval in *White v. Baxter Healthcare*, ___ F.3d ___, 2008 WL 2607893, at *7 (6th Cir. July 3, 2008) (finding that plaintiff's "superior qualifications" coupled with the employer's "subjective" proffered perceptions of plaintiff as "aggressive" and "lacking in management vision" were sufficient evidence of pretext to survive summary judgment)). "Pretext, however, cannot be shown by attacking the decision itself." *Hein v. All American Plywood Co., Inc.*, 232 F.3d 482, 490 (6th Cir. 2000).

Defendant contends that Plaintiff cannot show pretext because the company's decision

had a basis in fact – her violation of Rule 72 was serious enough to motivate the dismissal from service – and Defendant points to 13 male employees who were terminated after damage or derailment incidents between 2000 and 2004.  (Dkt. 28 at 18, 23-25.)

At oral argument, to support her contention that Defendant's reason was pretextual, Plaintiff relied on an event report/investigatory request completed by A.J. Erdman, Trainmaster, wherein he placed X's after "life critical violation" and "employee out of service" under "event details."  (Dkt. 28, Ex. 14 at 115; Dkt. 33 at Ex. 5.)  In addition, the report notes that Tony Tuchek, Regional Vice President,[10] indicated that "[t]his is to be considered an egregious act."  (*Id.*)  It should be noted, however, that in the form filled out, there is no "event detail" mentioning "egregious" as a possible categorization of the event.  Plaintiff contends that this form confirms what Plaintiff was told by Mr. Erdman, that she would not be fired for the incident, but instead would be given the punishment imposed for "life critical violations" which is a thirty-day suspension.  (Dkt. 31 at 5, Ex. 6.)  Plaintiff asserted at oral argument  that the form shows that Defendant violated its own policy by forming a conclusion, i.e., that the conduct was "egregious," before investigating the matter.

Defendant countered by noting that Mr. Tuchek explained in his deposition that he called Plaintiff's conduct "egregious" because then he would have the ability to take Plaintiff "out of service" pending the investigation, which he did.  (Dkt. 28, Ex. 19 at 78-79.)  I note that a mark was made on that same form next to "employee out of service."  (Dkt. 28, Ex. 14 at 115; Dkt. 33 at Ex. 5.)

---

[10]Mr. Tuchek's title was derived from Defendant's brief. (Dkt. 28 at 12.)

I conclude that Plaintiff is unable to show that there was no basis in fact for her discharge since she has admitted to committing the Rule 72 violation that led to her discharge as well as a series of other actions for which she was disciplined in the past. (Dkt. 28, Ex. 11 at 13-14.) Therefore, I suggest that Plaintiff simply cannot successfully maintain that the "proffered bases for plaintiff's discharge never happened" or were "factually false." *Abdulnour*, 502 F.3d at 502-03.

I further suggest that Plaintiff cannot demonstrate that Defendant's reasons did not "actually motivate" Defendant. Plaintiff has not come forward with any evidence to show that discrimination makes it "more likely than not" that the employer's explanation is a pretext. *Id.* at 503. Plaintiff cannot show that the challenged conduct – giving clearance for a train to enter a track knowing that a contractor's equipment and employees were still on the track (even assuming they were moving and could potentially get off the track in time) – was "insufficient" to warrant dismissal. Nor has Plaintiff shown how Defendant's decision was so "idiosyncratic" or "questionable" that only pretext could explain an otherwise obtuse decision. *Loeb*, 600 F.2d at 1012.

Finally, Plaintiff has not come forward with any evidence beyond merely "attacking the decision itself," which is insufficient to show pretext. *Hein*, 232 F.3d at 490. Plaintiff's failure to show pretext is further deflated by the undisputed evidence that Defendant terminated 13 male employees after damage or derailment incidents between 2000 and 2004. (Dkt. 28 at 18, 23-25.)

I further suggest that the form referenced above does not appear to be as internally inconsistent or otherwise probative of pretext as Plaintiff suggests. First, there was no

"egregious" category for Mr. Erdman to choose, so his choosing "life critical violation" and "employee out of service" is not inconsistent with Defendant's finding that the conduct was not only "life critical" but also "egregious," such that Plaintiff would be taken "out of service." (Dkt. 28, Ex. 14 at 115; Dkt. 33 at Ex. 5.)

To the extent Plaintiff posits that Defendant's failure to abide by its internal policy to withhold disciplinary judgment until after the formal investigation hearing is evidence of pretext, I suggest that unless there is evidence to show that this alleged policy breach was committed out of a desire to discriminate, it is irrelevant to this Title VII action. Title VII does not permit suit simply because a plaintiff was treated less favorably than "someone's general standard of equitable treatment." *Batts*, 844 F.2d at 337. Plaintiff's own testimony reveals that her disagreement with Defendant is largely based on her notion that she was treated unfairly, rather than that she was discriminated against based on her gender. (*See* Pl.'s Dep., Dkt. 28, Ex. 12 at 97, indicating that she believed she was wrongfully terminated because "I should have had the 30 days off and that would have be it, and I would have gladly done that. But they had a hearing and then I got a letter and I was fired.").

I therefore suggest that since there is no evidence tending to show that Defendant's proffered reason was a pretext for discrimination, Defendant's motion for summary judgment should be granted. *See Brennan v. Tractor Supply Co.*, 237 Fed. App'x 9, 10 (6th Cir. 2007) ("even if [the supervisor] had, in fact, 'disliked'[plaintiff], there is no evidence that his dislike for [plaintiff] was in any way related to [plaintiff's] age or in any way reflected age animus. Without this, it is simply a personal distaste, and wholly insufficient to support an age bias claim").

## III.  REVIEW

The parties to this action may object to and seek review of this Report and Recommendation within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan,* 431 F.3d 976, 984 (6th Cir. 2005).  The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation.  *McClanahan v. Comm'r of Social Security*, 474 F.3d 830, 837 (6th Cir. 2006); *Frontier Ins. Co.,* 454 F.3d at 596-97.  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.


 s/ 𝒞harles 𝓔 𝓑inder
CHARLES E. BINDER
Dated: August 21, 2008                          United States Magistrate Judge


## CERTIFICATION

I hereby certify that this Report and Recommendation was electronically filed this date, electronically served on Gregory G. Paul, John B. Lewis, and Michelle B. Anselmo, and served on District Judge Ludington in the traditional manner.


Date:  August 21, 2008          By    s/Patricia T. Morris
                                Law Clerk to Magistrate Judge Binder